# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | | |
|---|---|---|---|
| KENNETH A. JONES, | ) | | |
| | ) | | |
| Petitioner, | ) | | |
| | ) | | |
| v. | ) | Nos. | 1:07-CR-25-HSM-SKL-1 |
| | ) | | 1:12-CV-94-HSM |
| UNITED STATES OF AMERICA, | ) | | |
| | ) | | |
| Respondent. | ) | | |

## **MEMORANDUM OPINION**

Before the Court is Petitioner's pro se motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 [Doc. 170]. During pendency of the petition, Petitioner filed three "supplements" to the original filing; this Court construes each as a request for leave to amend [Docs. 182, 214, 224]. The most recent supplement relies on *Johnson v. United States*, 135 S. Ct. 2551 (2015), in which the Supreme Court held that the residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), was unconstitutionally vague [Docs. 224, 225]. The United States filed multiple responses in opposition [Docs. 192, 230]; Petitioner submitted an affidavit in support of his claims [Doc. 171]. Also before the Court are pro se requests to "compel" [Docs. 234, 242], and for an extension of time to reply [Doc. 235]. For the following reasons, Petitioner's first and third motions for leave to amend [Doc. 182, 224] will be **GRANTED**, second motion for leave to amend [Doc. 214] will be **DENIED**, and amended petition [Docs. 170, 182, 225] will be **DENIED** and **DISMISSED WITH PREJUDICE**. The motions for an extension of time to reply and to compel [Docs. 234, 235, 242] will be **DENIED as moot**.

## I.    BACKGROUND

### A.    Facts regarding Petitioner's offense conduct, jury trial, and convictions

The United States Court of Appeals for the Sixth Circuit summarized Petitioner's offense

conduct as follows:

> [This case] arose out of an incident which took place on June 11, 2006, in Chattanooga, Tennessee. Two Chattanooga police officers, Mickel Hoback and Derrick Pendergrass, were sitting in their patrol cars at a gas station when a woman approached them and complained that she had been robbed at gunpoint at a nearby residence. The officers drove her to the duplex where the incident allegedly occurred, and the officers walked up to the door of a screened-in porch in front of the house. The top half of the screen door to the porch had no glass or covering so that, from their vantage point, the officers could clearly observe individuals holding crack pipes and wiping a white powder from a coffee table.
>
> The officers testified that they asked one of the individuals in the front of the house if they would mind if the officers entered, and the individual, later identified as James Richard Williams, replied, "No." However, Williams testified at a suppression hearing prior to trial that he was not in the front of the house when the police came and did not give the officers permission to enter. It is not disputed that another individual, Thomas Tucker, unlocked the screen door to let the officers in.
>
> Once inside, the officers observed powder residue on a table, and a crack pipe. Officer Hoback remained in the front part of the house while Officer Pendergrass, with Williams's permission, conducted a sweep of the rest of the house and gathered everyone into the front. When Pendergrass entered the kitchen, he found Jones and a female, later identified as Bridget Smith. Pendergrass also found, in plain view on a table where Jones was sitting, packaged and unpackaged powder and crack cocaine and a 9 mm pistol with the barrel pointed directly at Pendergrass. Pendergrass seized the cocaine and the gun. A subsequent lab report showed that Pendergrass seized 11.06 grams of cocaine base and 4.9 grams of powder cocaine.
>
> Smith testified that she was in the kitchen with Jones at the duplex at the time police entered the home and that Jones had placed the cocaine and the gun on the table. She also testified that she had observed Jones cooking the powder into crack. Amy Newman was charged as a co-conspirator and testified that, in 2006, she received from $400 to $500 worth of cocaine from Jones and Smith each day. Newman had been present when Jones purchased powder cocaine from suppliers and cooked it into crack and had purchased drugs from Jones as early as October 2005.

2

[Doc. 164 pp. 1–2].

On February 27, 2007 a federal grand jury returned a four count indictment against petitioner and co-defendant Amy Newman, alleging their involvement in a crack cocaine conspiracy and firearm possession [Doc. 1]. Petitioner and Newman were charged jointly with conspiracy to distribute fifty grams or more of cocaine base ("crack"), in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) (Count One); and knowingly possessing a firearm in furtherance of a drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1) (Count Two) [*Id.*]. Petitioner was charged individually with possession of firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Three) [*Id.*].

Petitioner made his initial appearance on May 3, 2007, and Attorneys Hallie McFadden and Hilary Stuart were appointed to represent him [Doc. 12]. On August 13, 2007, Attorneys McFadden and Stuart filed a motion to substitute counsel, citing "irreconcilable differences" between Petitioner and counsel [Doc. 28]. After a hearing on August 23, 2007, the motion was granted and Attorney John Brooks was appointed to represent Petitioner [Docs. 30, 31].

On September 10, 2007, Newman pled guilty to Counts One and Two of the indictment [Doc. 32]. Shortly thereafter, petitioner through counsel filed a motion to suppress evidence obtained from a June 11, 2006, search of the residence at 3609 Third Avenue, Chattanooga, Tennessee [Doc. 37]. The Court denied the motion after an evidentiary hearing [Docs. 55, 58, 60]. On March 24, 2008, the scheduled trial date, Attorney Brooks was relieved as counsel pursuant to an oral motion to withdraw [Docs. 84, 86]. Attorney Dan Ripper was appointed as replacement counsel and the trial date was rescheduled [Docs. 86, 89].

On July 14, 2008, petitioner proceeded to trial [Docs. 107-109]. On July 16, 2008, the jury returned guilty verdicts on the lesser included offense in Count One of conspiracy to

distribute more than 5 grams of crack cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B), and guilty as charged on Counts Two and Three [Doc. 112].

Petitioner through counsel filed a written motion for judgment of acquittal under Fed. R. Crim. P. 29 [Doc. 122]. Petitioner also filed three pro se motions: a motion to dismiss, a motion for new trial under Fed. R. Crim. P. 33(a), and a motion to appoint new counsel [Docs. 123–125]. After an attorney representation hearing was held, Petitioner's motion for new counsel was denied [Doc. 128]. On November 3, 2008, the Court issued a memorandum order denying Petitioner's motion for acquittal and new trial [Doc. 135].

### B. Facts Regarding Petitioner's Sentence and Direct Appeal

In calculating the applicable Guidelines range, using the 2007 version of the Sentencing Guidelines, the United States Probation Office noted that Petitioner was responsible for distributing more than 5 grams of cocaine base, resulting in a base offense level of twenty-four for Count One [Presentence Report (PSR) at ¶ 19]. For the drug conspiracy calculations, Petitioner received a two-level enhancement yielding an adjusted offense level of twenty-six [*Id.* ¶¶ 22–24]. This enhancement was pursuant to Section 3B1.1(c) of the United States Sentencing Guidelines for his role in the offense by which individuals worked at his direction in the distribution, delivering, and taking payment of drugs [*Id.*]. No enhancement was applied for possession of a dangerous weapon in connection with the drug offense because Petitioner was also convicted under 18 U.S.C. § 924(c) [*Id.* ¶ 20]. For the § 924(c) count, Petitioner was subjected to a mandatory term of Life imprisonment, pursuant to the enhancement provisions of 18 U.S.C. § 3559(c), due to his prior armed and aggravated robbery convictions [*Id.* ¶ 25]. Lastly, for the § 922(g) count, the Guidelines called for a base offense level of twenty-four given

4

that Petitioner had sustained at least two felony convictions for crimes of violence previous to committing the instant offense [*Id.* ¶ 26].

Petitioner had twelve criminal history points, resulting in a criminal history category of V, however, this was enhanced to VI because he was deemed to be a career offender, pursuant to Section 4B1.1(b), and an armed career criminal, pursuant to Section 4B1.4(c)(2) [*Id.* ¶¶ 53–55]. Petitioner's was initially assigned an adjusted offense level of twenty-six for Count One, but that level was increased to thirty-seven under Section 4B1.1(b)(A); the result: 360 months to Life for Count One [*Id.* ¶ 35]. When combined with the mandatory term of Life for the § 924(c) count, Petitioner's received an effective range of Life imprisonment [*Id.* ¶ 72].

The Court found that the PSR correctly stated the applicable facts and accurately calculated Petitioner's Guidelines range, and sentenced petitioner to imprisonment for a term of 360 months on Counts One and Three, to be served concurrently, plus Life on Count Two, to be served consecutively [Doc. 139]. Petitioner filed two more motions for new trial, which this Court denied on July 23, 2010 [Docs. 147, 155], and December 2, 2010 [Docs. 151, 159].

Petitioner appealed, challenging the Court's denial of his suppression motion and dismissal of motions for new trial based upon a sufficiency of evidence theory [Doc. 164]. On September 19, 2011, the Sixth Circuit affirmed Petitioner's convictions and sentence, finding that the Court "properly denied [Petitioner's] motion to suppress," and that "the evidence presented at [Petitioner's] trial was more than sufficient to sustain his conviction for conspiracy to distribute in excess of [5] grams of crack cocaine" [*Id.* at 4, 6]. The Supreme Court denied Petitioner's request for a writ of certiorari on January 24, 2012 [Doc. 169].

Two and a half months later—on March 15, 2012—Petitioner filed the instant collateral challenge with nineteen grounds for relief [Doc. 170]. Petitioner filed his first supplement on

August 16, 2012, reiterating several of the facts and arguments set forth in his original petition [Doc. 182]. He filed a second supplement on January 21, 2014, asserting several novel grounds for collateral relief [Docs. 214, 215], and a third supplement on June 1, 2016, seeking relief based on the *Johnson* decision [Docs. 224, 225].

## II.     TIMELINESS OF PETITION AND SUPPLEMENTS

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the one-year statute of limitations applicable to collateral challenges under § 2255 runs from the latest of: (1) "the date on which the judgment of conviction becomes final;" (2) "the date on which the impediment to making a motion created by Governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such Governmental action;" (3) "the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review;" or (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f). Amended claims and defenses are subject to the same limitations period as the original motion. *Cameron v. United States*, No. 1:05-cv-264, 2012 WL 1150490, at *3–6 (E.D. Tenn. April 5, 2012) (citing *Olsen v. United States*, 27 F. App'x 566 (6th Cir. Dec. 14, 2001)). Petitioner has failed to demonstrate that subsections (f)(2) or (f)(4) apply to his case. i.e., he has not established that any illegal action by the government prevented him from making the timely petition or the existence of facts affecting his case that could not have previously been discovered through the exercise of due diligence. As such, timeliness of the petition [Doc. 170] and proposed supplements [Docs. 182, 214, 224] depend on whether or not Petitioner submitted those documents in compliance with subsections (f)(1) and (f)(3).

6

## A. Timeliness of Original Petition and Proposed Amendments

For purposes of the subsection (f)(1)—where the statutory period expires one year from the date on which the judgment of conviction becomes final—a "conviction becomes final at the conclusion of direct review." *Brown v. United States*, 20 F. App'x 373, 374 (6th Cir. 2001) (quoting *Johnson v. United States*, 246 F.3d 655, 657 (6th Cir. 2001)). Where a defendant pursues direct review through to a petition for certiorari, direct review concludes when the Supreme Court either denies the petition for certiorari or decides the case. *Clay v. United States*, 537 U.S. 522, 532 (2003). Petitioner's one-year period for requesting relief under subsection (f)(1) expired on January 24, 2013, one year after his conviction became final for purposes of that section on January 24, 2012 [Doc. 169]. The original petition—filed on March 15, 2012— and first supplement—placed in the prison mail system on February 9, 2012—fall safely within the permissible period. As such, the motion associated with the latter will be granted.[1] Neither the second nor third supplements were filed within the window for requesting timely relief under subsection (f)(1).

While it is true that Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend should "be freely given when justice so requires," Fed. R. Civ. P. 15(a), relevant factors include "undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Anderson v. Young Touchstone Co.*, 735 F. Supp. 2d 831, 833 (W.D. Tenn. 2010) (quoting *Forman v. Davis*, 371 U.S. 178, 182 (1965)). Because futility of the proposed amendment is a permissible basis on which to deny a motion for

---

[1] Because Petitioner is currently incarcerated, his motion is deemed filed on the date it was delivered to the appropriate prison officials for mailing. *See* Rule 3(d) of the Rules Governing Section 2255 Proceedings (establishing the "prison mailbox rule").

leave to amend, *see Forman*, 371 U.S. at 182 (noting grant or denial of a motion to amend is within the discretion of the district court), resolution of Petitioner's second and third motions to amend depend on compliance with subsection (f)(3), equitable tolling of the window under subsection (f)(1), or relation back of the proposed claims to a timely-filed ground of collateral attack.

The second supplement articulates several theories of ineffective assistance, prosecutorial misconduct, and legal error [Doc. 215]. The ineffective assistance claims cite: failure to convey a plea offer from the United States [*Id.* at 2]; failure to object to several portions of the prosecutor's closing argument [*Id.* at 2–3, 7]; and failure to make certain objections to the jury instructions [*Id.* at 7–12]. The prosecutorial misconduct claims suggest that the prosecutor: allowed a witness to commit perjury [*Id.* at 4–5]; told the jury that Petitioner was "extorting money from people for drugs" [*Id.* at 3, 5–6]; and mentioned Petitioner's prior state charges for armed robbery [*Id.* at 6–7]. In addition to the foregoing, the supplement claims that Petitioner's "sentence under the ACCA is unconstitutional" and that "the Supreme Court may rule that the entire ACCA is unconstitutionally vague" [*Id.* at 5]. The third supplement challenges his ACCA designation, career offender enhancement, and § 924(c) conviction based on the *Johnson* decision [Doc. 224].

To the extent Petitioner attempts to rely on subsection (f)(3)'s independent one-year filing period for relief based on a newly-recognized right made retroactively applicable on collateral review to justify submission of the second and third supplements after January 24, 2013, only the latter filing arguably satisfies the conditions required to trigger the renewed limitations period. *See* 28 U.S.C. § 2255(f)(3) (requiring reliance on a newly recognized and retroactively applicable right); *see also Welch v. United States*, 136 S. Ct. 1257, 1265 (2016)

("*Johnson* is . . . a substantive decision and so has retroactive effect . . . in cases on collateral review."); *In re Windy Watkins*, 810 F.3d 375, 380–81 (6th Cir. 2015) (finding *Johnson* constitutes a new substantive rule of constitutional law made retroactively applicable on collateral review and thus triggers § 2255(h)(2)'s requirement for certification of a second or successive petition). Accordingly, the third motion for leave to amend will be granted; resolution of the second motion for leave to amend depends on tolling of the statute of limitations or relation back of untimely claims.

### B.     Equitable Tolling of Subsection (f)(1)

Section 2255(f)'s statute of limitations is not jurisdictional and may be tolled under limited, extraordinary circumstances. *Dunlap v. United States*, 250 F.3d 101, 1007 (6lth Cir. 2001). Used sparingly, a petitioner bears the burden of establishing that equitable tolling applies to her case, *see Jurado v. Burt*, 337 F.3d 638, 642 (6th Cir. 2003); *Allen v. Yukins*, 366 F.3d 396, 401 (6th Cir. 2004), and must show "(1) that [s]he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in [her] way and prevented timely filing," *Holland v. Florida*, 130 S. Ct. 2549, 2562 (2010); *Hail v. Warden*, 662 F.3d 745, 750 (6th Cir. 2011); *see also Jurado*, 337 F.3d at 643 ("Absent compelling equitable considerations, a court should not extend limitations by even a single day.").

Review of the original petition and later-filed supplements fail to reveal a single extraordinary circumstance justifying Petitioner's failure submit those filings within the one-year window permitted by subsection (f)(1). *Compare Stovall v. United States*, No. 1:12-cv-377, 2013 WL 392467, at *3 (E.D.T.N. Jan. 31, 2013) (rejecting request for equitable tolling of subsection (f)(1) in absence of evidence illustrating a diligent pursuit of the rights asserted); *with Jones v. United States*, 689 F.3d 621, 627 (6th Cir. 2012) (granting request for equitable tolling

9

where the petitioner pled facts indicating he had been separated from his legal materials for an extended period of time due to multiple detention transfers and an illness). As such, no tolling will occur.

### C. Relation Back Under Rule 15(c)

When an amendment is untimely, the Court looks to Rule 15(c) to determine whether the proposed claim "relate[s] back" to a timely, original pleading and is thus saved from being time barred by expiration of the statute of limitations. *Mayle v. Felix*, 545 U.S. 644, 656–57 (2005), *overruled on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562–63 (2007). The amended claim relates back if it "ar[i]se[s] out of the [same] conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed. R. Civ. P. 15(c)(2). The Supreme Court has rejected a broad reading of "conduct, transaction, or occurrence" in the context of post-conviction relief and explained an amended petition will not relate back "when it asserts a new ground for relief supported by facts that differ in both time and type from those [set forth in] the original pleading." *Felix*, 545 U.S. at 650. In other words, "relation back depends on the existence of a common 'core of operative facts' uniting the original and newly asserted claims." *Id.* at 658 (citations omitted).

For purposes of the instant case, comparison of the claims in Petitioner's second supplement with those raised in the timely petition and supplements reveal that none of the grounds in the former share a core of operative fact with any of the grounds in the latter. This conclusion is bolstered by the fact that Petitioner himself characterizes the arguments in his second supplement as "new" freestanding claims. Because it would be futile to supplement the amended petition with time-barred grounds, the second request for leave to amend will be denied.

## III. REMAINING NON-DISPOSTIVE MOTIONS

In addition to the amended petition, the Court is in possession of Petitioner's pro se motion for an extension of time to file a reply to the United States' response in opposition to Petitioner's second and third motions for leave to amend [Doc. 235].  Because Petitioner has failed to file a reply in the thirteen months since the Court granted his last request for an extension [Docs. 232, 233], the motion will be denied.  Also before the Court are a pair of *pro se* requests that the Court "compel" officials at the Bureau of Prisons to return legal papers lost when Petitioner was moved between federal facilities [Docs. 234, 242].[2]  Because Petitioner has not made the content or necessity of these materials clear and because there is no need for additional briefing in the instant matter, these pro se motions will be denied.

## IV. STANDARD OF REVIEW

To obtain relief under 28 U.S.C. § 2255, a petitioner must demonstrate "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law . . . so fundamental as to render the entire proceeding invalid." *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496–97 (6th Cir. 2003)).  He "must clear a significantly higher hurdle than would exist on direct appeal" and establish a "fundamental defect in the proceedings which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." *Fair v. United States*, 157 F.3d 427, 430 (6th Cir. 1998).

---

[2]      The motions are identical except for the fact that the first motion lacks a signature [*Compare* Doc. 234, *with* Doc. 242].

## V.    ANALYSIS

The supplemented petition contains twenty grounds for collateral relief: fifteen allege ineffective assistance of counsel, six argue prosecutorial misconduct, and three assert legal error. The ineffective assistance claims challenge: failure to attack the indictment based on the fact that African Americans were systematically excluded from the grand jury and a "federal hold" was placed on Petitioner's case (Ground One) [Doc. 170 pp. 23–27]; failure to call all four of the witnesses that Petitioner identified as material to his defense (Ground Two) [*Id.* at 8]; failure to investigate allegations that Officer Pendergrass was corrupt (Ground Three) [*Id.* at 20–2]; failure to investigate allegations that Officer Pendergrass or Bridgett Smith planted key evidence (Ground Four) [*Id.* at 20–22, 25–26]; failure to shape the defense strategy around the above allegations of corruption and fabricated evidence (Ground Five) [*Id.* at 25–26]; failure to investigate a potential breach in chain of custody of the drugs tested by Tennessee Bureau of Investigation (TBI) (Ground Six) [*Id.* at 19–20, 22–23]; failure to investigate whether the juror who went missing during deliberation participated in a "mock trial" at home (Ground Seven) [*Id.* at 23–24]; failure to seek a "*Remmer* hearing" after learning that the above-referenced juror left the courthouse without permission (Ground Eight) [*Id.* at 24–25]; failure to seek mistrial based on the resulting breach in juror separation (Ground Nine) [*Id.* at 16–17]; encouraging Petitioner to commit perjury (Ground Ten) [*Id.* at 36]; and failure to request a writ of certiorari (Ground Eleven) [*Id.* at 15].  The claims of prosecutorial misconduct allege: failure to disclose that the United States "imposed [its] might" on the grand jury in an effort to obtain an indictment (Ground Twelve) [*Id.* at 37–39]; improper introduction of letter implying the existence of a "subsidiary conspiracy" (Ground Thirteen) [*Id.* at 4]; failure to disclose *Brady* and *Giglio*

12

materials (Ground Fourteen) [*Id.* at 5]; failure to provide defense counsel with a list of expert witnesses and provide information about their testimony (Ground Fifteen) [*Id.* at 27–28]; facilitation of perjury by Officer Pendergrass (Ground Sixteen) [*Id.* at 28–31]; and alteration of Officer Pendergrass's affidavit with goal of "covering up" that perjury (Ground Seventeen) [*Id.* at 33–35]. The allegations of legal error are: Petitioner's absence during discussions about the missing juror (Ground Eighteen) [*Id.* at 7]; the Court's failure to properly address juror absence or remedy situation by "admonishing" members of the jury (Ground Nineteen) [*Id.* at 18, 19, 31–32]; and improper categorization as an armed career criminal, enhancement as career offender, and § 924(c) conviction in light of the *Johnson* decision (Ground Twenty) [Doc. 225].[3]

## A.    Ineffective Assistance Claims

A petitioner alleging ineffective assistance must satisfy the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1987). First, the petitioner must establish, by identifying specific acts or omissions, that counsel's performance was deficient and that counsel did not provide "reasonably effective assistance," *id.*, as measured by "prevailing professional norms," *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). Counsel's assistance is presumed to have been effective, and the petitioner bears the burden of showing otherwise. *Mason v. Mitchell*, 320 F.3d 604, 616–17 (6th Cir. 2003); *see also Strickland*, 466 U.S. at 689 (a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action might be considered sound . . . strategy" (internal citation omitted)).

---

[3]    The Court has renumbered and reorganized Petitioner's claims for relief. Two grounds from the original petition—eight and sixteen as originally listed—contained multiple theories. Those theories have been treated as independent grounds of collateral attack.

Second, the petitioner must demonstrate "a reasonable probability that, but for [counsel's acts or omissions], the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691; *see also Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). If a petitioner fails to prove that he sustained prejudice, the Court need not decide whether counsel's performance was deficient. *See United States v. Hynes*, 467 F.3d 951, 970 (6th Cir. 2006) (holding that alleged "flaws" in trial counsel's representation did not warrant a new trial where the claims, even if true, did not demonstrate that the jury would have reached a different conclusion).

## 1. Grounds One: Failure to Attack Indictment

Petitioner argues that counsel was ineffective for failing to attack the indictment on the basis that African Americans were systematically excluded from the grand jury and because the Court put his case on what Petitioner characterizes as a "federal hold" for more than a year.

The first theory—grand jury composition—fails because Petitioner bears the burden of articulating sufficient facts to state a viable claim for relief and conclusory statements without substantiating allegations of specific facts fail to state a cognizable claim under § 2255. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972). The unsupported allegation that African Americans were systematically excluded from the grand jury without any evidence of the same falls short of the level of proof necessary to succeed on collateral review. *See O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961) ("Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing.").

The Court interprets Petitioner's second theory—placement of a "federal hold" on his case—as a suggestion that counsel should have requested dismissal based on a violation of the

14

Speedy Trial Act. That Act requires "[i]n any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days of the filing date of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. 3161(c)(1). Exclusions are allowed for:

> Any period of delay resulting from other proceedings concerning the defendant, including but not limited to . . . (D) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of such motion . . . and (H) delay reasonably attributable to any period, not exceeding thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

18 U.S.C. § 3161(h)(1). Exclusions also apply to "any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the [United States], if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A).

For purposes of the instant case, Petitioner was arrested and arraigned on the indictment on May 3, 2007 [Docs. 12, 14]. Trial was initially set for July 10, 2007, i.e., sixty-eight days after his arrest [Doc. 16]. On May 29, 2007, Petitioner through counsel filed a motion to continue the trial [Doc. 18], and this Court granted the motion in an ends-of-justice scheduling order setting a new trial date for September 11, 2007 [Doc. 20]. On August 2, 2007, Petitioner filed a second motion to continue the trial date [Doc. 25], and this Court granted that motion in an ends of justice scheduling order setting a new trial date of November 13, 2007 [Doc. 25]. Eleven days later, on August 13, 2007, Petitioner filed a motion to replace counsel [Doc. 28],

15

which this Court granted after a hearing on August 31, 2007 [Doc. 31]. On October 15, 2007, Petitioner through counsel filed a motion to suppress [Doc. 37], which resulted in cancellation of the previously-scheduled November 13, 2007 trial date [Doc. 38]. In an effort to resolve the pending motion to suppress, this Court held an evidentiary hearing on January 22, 2008 [Docs. 55, 60]; it issued an ends of justice scheduling order that same day setting trial for March 24, 2008 [Doc. 61]. Between February 19, 2008 and February 25, 2008, Petitioner submitted two motions to compel the production of certain documents and one motion to quash a subpoena [Docs. 64, 67, 68]. The motions were collectively addressed by this Court in an Order entered on March 21, 2008 [Doc. 82]. Three days later, on March 24, 2008—the designated trial date— counsel moved to withdraw from representation of Petitioner [Doc. 84]. This Court again appointed new counsel and issued an ends of justice scheduling order with a new trial date of July 15, 2008 [Doc. 86 (providing new counsel with time to prepare)]. The trial commenced as scheduled on July 15, 2008.

In light of the foregoing, the Court finds that only fifty-six countable days passed between Petitioner's arrest and trial. As such, any motion seeking dismissal of the action on the basis of the Speedy Trial Act would have been denied. Because counsel cannot be held to have been ineffective for failing to make a meritless motion, this ground provides no basis for relief. *See, e.g.*, *Hoffner v. Bradshaw*, 622 F.3d 487, 499 (6th Cir. 2010) (explaining that counsel cannot be held constitutionally ineffective for failing to pursue meritless claim or raise a meritless objection).

### 2. Ground Two: Failure to Call Witnesses Requested by Petitioner

Petitioner argues that counsel was ineffective because he refused to call four witnesses that Petitioner identified as having information relevant to the defense. Petitioner seems to

16

suggest that each of the witnesses would have supported the claim that Officer Pendergrass was corrupt, approached Petitioner about illegally running weapons, and planted evidence as retribution for Petitioner's refusal.

What evidence to present and whether to call or question a particular witness are presumed to be matters of trial strategy and only constitute ineffective assistance of counsel when the decision deprives the defendant of a substantial defense. *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004). There is never an obligation to call a witness whose testimony would not have exculpated the defendant. *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004).

Review of the CM/ECF record reveals the following: Petitioner wanted to base his defense on allegations that Officer Pendergrass was corrupt and had planted key drug evidence in an effort to get back at Petitioner for refusing to run weapons to Atlanta; defense counsel disagreed with the proposed strategy and ultimately decided to forego that theory of defense in favor of one that he believed provided Petitioner with the best opportunity for acquittal and, in support of the defense selected, called several whiteness and thoroughly cross-examined those called by the United States [Doc. 108]. Because Petitioner has not demonstrated that counsel's conduct deprived him of a substantial defense, he cannot show that the challenged conduct deviated from professional norms.

### 3. Grounds Three, Four, and Five: Corruption and Fabricated Evidence

Petitioner claims that counsel should have done more to investigate allegations that Officer Pendergrass was "bias[ed] toward [Petitioner,] and [had] a motive to fabricate, lie, and commit perjury to convict [Petitioner] for refusing to engage in criminal conduct." He also alleges that counsel should have done more to investigate allegations that Officer Pendergrass

17

planted evidence at the scene, i.e., "manipulated the crime scene . . .to frame [Petitioner]" and "that a female at the scene pulled the firearm and drugs from her pocketbook and placed them on the kitchen table." He concludes by noting that "Billy Kirkwood's trial testimony . . . seems much more credible in light of [Officer Pendergrass'] apparent corruption and association with known violent criminals," and suggesting counsel should have crafted his defense strategy accordingly.

Review of the CM/ECF record demonstrates that, despite Petitioner's claim to the contrary, counsel did investigate the allegations and raised arguments related to corruption and fabrication of evidence in a motion for a new trial [Doc. 122 p. 4–5]. Because counsel did what Petitioner suggests should have been done—investigate the allegations and raise arguments related to the same, neither ground justifies granting of the requested relief.

To the extent that Petitioner suggests counsel should have raised the corruption and fabrication of evidence allegations earlier in the trial process, the Court disagrees for two reasons. First, it has already held in the context of a motion for new trial that the allegations are "incredible almost to the point of being laughable" [Doc. 151 p. 5], and that it was "preposterous to believe that Officer Pendergrass carried the cocaine and firearm on his person into the house in a deliberate plan to . . . falsely incriminate [Petitioner] when Officer Pendergrass had no way of knowing in advance that [Petitioner] would be present inside the house" [*Id.* at 11]. The Court is unaware of any reasons that it should revisit this prior determination. Second, even if counsel had mentioned the corruption allegations as a way of challenging Officer Pendergrass' credibility on cross-examination, ample unrelated evidence supported the jury's guilty verdict.

### 4.     Ground Six: Breach of Chain of Custody

Petitioner claims that there was a discrepancy between the amount of drugs found on June 11, 2006—the night of his arrest—and the amount of drugs tested by the TBI. He argues that counsel should have noticed the anomaly and investigated the possibility of a breach in the chain of custody. Even assuming—without finding—that counsel could have done more to investigate the alleged discrepancy, the ground fails because Petitioner was not prejudiced by the omission.

The following evidence was presented at trial: an agent from the TBI testified that he received 11.6 grams of an unidentified substance from Petitioner's arresting officer for testing and that the substance was identified as crack cocaine [Doc. 121 p. 54]; Newman and Smith testified that they conspired with Petitioner to distribute crack [*Id.* at 76–79, 116–17]; and Newman testified that she observed numerous meetings between Petitioner and his cocaine supplier at which Petitioner would obtain "two ounces" of cocaine and later "cook" the substance received into crack [*Id.* at 79, 80]. The forgoing provided jurors with sufficient evidence to convict Petitioner of conspiring to distribute 5 or more grams of crack cocaine even if they did not believe that Petitioner possessed all 11.6 grams tested by the TBI. *Accord United States v. Kinnard*, No. 91-6221, 1992 WL 162558, at *3 (6th Cir. July 13, 1992) ("[T]he government need to prove a perfect chain of custody. Gaps in the chain of custody affect the weight of evidence not [its] admissibility.").

### 5.     Ground Seven, Eight, and Nine: Missing Juror

Petitioner points to numerous omissions related to the missing juror as examples of conduct that fell below professional standards of care: not investigating Petitioner's claim that a

19

contact told him that the juror who went missing participated in an impermissible "mock trial" on the night that she left deliberation; not seeking a "*Remmer* hearing" after learning about the missing juror; and not seeking a mistrial based on the breach in juror separation.

Petitioner raised similar allegations in one of the motions for a new trial [Doc. 155]. The Court summarized the relevant facts as follows:

At the end of the first day of the jury's deliberations, a female juror prematurely left the courthouse to go drive her husband to his job without being excused by the Court. The trial transcript shows the following:

| | |
|---|---|
| THE COURT: | All right. The jury says that they want to go home and come back in the morning. We have one little problem. One juror is missing, disappeared. So, I don't know what we're going to do about that. A juror just is gone. So we know - - we can find out who it is. And what I'm going to do is bring the rest of them in and excuse them and tell them to come back at nine in the morning. Meanwhile, we'll try to locate that person and get them in here, if not, we may have to locate the alternates and bring them back. Is there any problem with that? |
| MR. WINNE: | No, Judge. .... |
| MR. RIPPER: | I don't think I have a problem if the alternates have remained at the courthouse the whole time, if they left the courthouse, what instructions would they - - were they given about how to proceed this evening? |
| THE COURT: | I just excused them. |
| MR. RIPPER: | Just released. |
| THE COURT: | We have another alternative, we can do it with 11 jurors. |
| MR. RIPPER: | Well, I mean, I'd rather not commit myself right now. Hopefully we'll find the 12th juror and we can go on. |
| THE COURT: | Okay. MR. RIPPER: How did this happen? |

20

| THE COURT: | I have no idea. (Brief pause) |
|---|---|

THE COURT:     Bring back the jury or what's left of the jury.

MR. RIPPER:     At what point, do we know, that the person—did the person leave?

THE COURT:     They haven't been deliberating, they just, it's just within the last—I don't know. (Whereupon, the jury returned to the courtroom and the proceedings continued as follows:)

THE COURT:     Who are we missing? Ms. [name omitted]. Ms. [name omitted]. What happened?

A JUROR:     She said she had to go get her husband. She just said she had to go pick up her husband. He had to be at work at 5:30 and she wasn't going to be able to make it there. That's all she told us. I think it was a misunderstanding. I think she thought she was free to go, come back, and she thought it was okay, she shot out the door.

THE COURT:     She left after you sent the message out?

A JUROR:     Yes.

THE COURT:     Okay. All right. Will somebody call her and tell her she needs to be here at—will you call her and make sure she gets here at 9:00?

A JUROR:     We told her.

THE COURT:     9:00 tomorrow morning.

A JUROR:     We told her anyway.

* * *

(Whereupon, the jury was excused from the courtroom and the proceedings continued as follows:)

|                |                                                        |
|----------------|--------------------------------------------------------|
| THE COURT:     | I don't think we have a problem, I think she'll be back here at 9:00. If we do, you all be thinking about what you want to do. |
| MR. RIPPER:    | I will.                                                |

[Doc. 159 pp. 17, 18].

The Court found that the situation did not require a new trial for three reasons. First, the missing juror "promptly returned the next morning and all [twelve] jurors continued their deliberations until they reached a unanimous guilty verdict" [*Id.* at 19]. Second, Petitioner had not been prejudiced by the absence of additional hearings on the matter because defense counsel was present for the incident and did not object to the solution reached [*Id.* at 19, 20]. Third, Petitioner had not established that the missing juror "did anything improper while away from the courthouse that evening which interfered with or had an adverse impact on the validity of the jury's deliberations" [*Id.* at 19]. In support of the latter, the Court noted that "Jones has no proof of any jury tampering" and rejected his references to "possible jury tampering [as] nothing more than pure speculation and conjecture" [*Id.* at 20].

### i. Failure to Investigate Alleged "Mock Trial"

Petitioner claims that he was contacted by an individual named Charlotte Chandler while incarcerated at the Hamilton County Jail. He claims that Ms. Chandler told him that the missing juror was her cousin and had a daughter who worked at the jail. Ms. Chandler also informed Petitioner that the juror's daughter was married to another employee of the jail, Officer Bruce and that she had learned from the daughter that the juror had conducted a "mock trial" on the night that she left deliberations without permission. Petitioner told counsel, but counsel failed to investigate.

Review of the CM/ECF record demonstrates that, despite Petitioner's claim to the contrary, counsel did investigate the information he received from Petitioner by calling Officer Bruce, determining that the juror's daughter did not work at the jail, and ultimately concluding that the allegations lacked credibility [Doc. 170-4 pp. 57, 58 ("Please know that I have investigated each of your allegations and concerns and have not found them to have sufficient merit to include in our [motion for a new trial].")]. Petitioner's allegation lacks basis in fact and, as a result, fails.

### ii.      Failure to Seek "*Remmer* Hearing"

Petitioner argues counsel should have requested a "*Remmer* hearing" and objected to "reassembling of the jury . . . after a total separation during deliberations."  Because no such hearing was needed, counsel was not ineffective for failing to seek one.  *Hoffner*, 622 F.3d at 499.

While it is true that the Supreme Court has held that that any private communication, contact, or tampering directly or indirectly, with a juror during a trial and about the matter pending before the jury is deemed presumptively prejudicial, *Remmer v. United States*, 347 U.S. 227, 229 (1954), the record is devoid of any evidence which suggests the missing juror experienced any such contact.  Nor is the Court aware of any information indicating that the missing juror did anything while away from the courthouse that interfered with or had any adverse impact on the validity of the jury's deliberations.

A district court is allowed to rely upon juror assurances of continued impartiality if it determines that those assurances are credible.  *United States v. Pennell*, 737 F.2d 521, 533 (6th Cir. 1984).  After a thorough investigation, this Court found that the juror genuinely believed she was able to leave and that the only reason for her departure was to get her husband from work.

23

There is no reason to revisit that determination. No "Remmer hearing" was necessary and counsel did not deviate from professional norms when he made the strategic decision not to seek one. *See, e.g.*, *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997) (deciding trial strategy includes the decision not to file certain motions if, after investigation, doing so would not be necessary or advantageous).

### iii.    Failure to Seek Mistrial

Petitioner suggests counsel should have requested a mistrial based on the breach in juror separation. When an allegation of juror misconduct arises, the Court is required to investigate the claim in order to determine whether the misconduct tainted the trial. *United States v. Lloyd*, 462 F.3d 510, 518 (6th Cir. 2006). In the current case, the Court conducted an inquiry, determined that the trial was not tainted, and decided to proceed [Doc. 157 pp. 69–71]. Given the circumstances, the Court reasoned that if the absent juror returned in the morning then there would be no problem in moving forward, but if the individual did not return the Court advised the attorneys to consider what options they would pursue to remedy the situation [*Id.* at 72]. Upon the juror's return the next morning, the Court thought it was fine to proceed and exhibited no concern of a threat to the integrity of the deliberations or verdict ultimately reached [*Id.*]. Petitioner has failed to establish any logical connection between the juror's departure and the guilty verdict returned the next day.

Speculation about what a juror might done without any proof that she actually did that thing does not warrant a new trial. Because the motion that Petitioner argues should have been filed would have been denied, counsel was not ineffective for failing to file it. *Hoffner*, 622 F.3d at 499.

### 6. Ground Ten: Perjury

Petitioner claims that counsel "attempt[ed] to induce [him] to commit . . . perjury" by suggesting that Petitioner testify at trial that he "didn't really know [the co-conspirator]." Counsel denies making request [Doc. 192-1]. Even if the Court were to find the request had been made—it does not, Petitioner cannot establish that was prejudiced because he choose not to testify at trial.

### 7. Ground Eleven: Writ of Certiorari

Petitioner claims that he requested counsel file a writ of certiorari, but that counsel failed to comply. He argues that this omission amounted to a deviation from professional norms.

The theory fails for two reasons. First, review of the CM/ECF record shows that counsel did file a writ of certiorari on Petitioner's behalf and the Supreme Court denied that writ on January 24, 2012 [Doc. 169]. Second, even if counsel had not complied with the request, that omission would not merit collateral relief because Petitioner does not have a right to counsel while seeking a writ of certiorari. *See Nichols v. United States*, 563 F.3d 240, 248 (6th Cir. 2009) ("[T]he Constitution does not entitle a defendant to the assistance of counsel for a discretionary appeal." (citing *Ross v. Moffitt*, 417 U.S. 600 (1974))). It is well established that where there is no constitutional right to counsel, there can be no deprivation of effective assistance. *Wainwright v. Torna*, 455 U.S. 586, 587–88 (1982).

### B. Prosecutorial Misconduct Claims

In addition to the above-stated theories of ineffective assistance, Petitioner asserts the following theories of prosecutorial misconduct: failure to disclose that the United States "imposed [its] might" on the grand jury in an effort to obtain an indictment; improper

introduction of letter implying the existence of a "subsidiary conspiracy;" failure to disclose *Brady* and *Giglio* materials; failure to provide defense counsel with a list of expert witnesses and information about their testimony; facilitation of perjury; and alteration of evidence to "covering up" that perjury.

To prevail on a claim of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Anderson v. United States*, 246 F. Supp. 2d 758, 760 (2003) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). The Sixth Circuit has adopted a two-step approach for determining whether prosecutorial misconduct violates a defendant's due process rights. *See Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002) (citing U*nited States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)).

First, the Court must consider whether the identified conduct or remarks were improper. *See Macias*, 291 F.3d at 452 (citing same). Second, if the Court concludes that the remarks were improper, then the Court must apply the four-factor test set forth by the Sixth Circuit in *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994), to determine "whether the impropriety was flagrant" and thus violated the defendant's due process rights. *Macias*, 291 F.3d at 452 (quoting Carter, 236 F.3d at 783). The four factors are: (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong. *See Macias*, 291 F.3d at 452 (quoting *Carter*, 236 F.3d at 783).

### 1. Ground Twelve: Grand Jury Manipulation

Petitioner claims that the United States obtained the indictment against him by impos[ing] [its] might" on the grand jury and failed to disclose that information to defense counsel.  The ground fails because it is unclear what Petitioner means by "imposed [its] might" and he has not provided any factual support for the claim.  *O'Malley*, 285 F.2d at 735.

### 2. Ground Thirteen: Implication of "Subsidiary Conspiracy"

Petitioner argues that the United States' introduction of a four-page letter at trial was improper because "a subsidiary conspiracy may not be implied form circumstantial evidence" and "the statements in the letter[] were not made in furtherance of the conspiracy, and [thus] should not have been introduce[d] into evidence."  He cites Federal Rule of Evidence 801(d)(2)(E) and *Grunewald v. United States*, 353 U.S. 391 (1957), but provides no additional information.

Review of the CM/ECF record leads the Court to believe that the letter to which Petitioner refers is Government Exhibit 8, one of two letters written by Petitioner and mailed to his co-defendant [Doc. 121 pp. 106–9]. The Court construes his argument as a challenge to its admission of the letter on the basis that the letter contained impermissible hearsay.  The Court disagrees.

Because it has been established that Petitioner was the author of the letter, its contents are admissible under Federal Rule of Evidence 801(d)(2)(A) and thus not hearsay.  *Accord United States v. Henderson*, 626 F.3d 326, 329 (6th Cir. 2010) (finding recorded telephone conversations between defendant, while incarcerated, and others regarding attempts by him and his family to influence witnesses in the case, and regarding his feelings about victims' deaths,

were admissible as non-hearsay admissions under Rule 801(d)(2)(A)); *United States v. Porter*, 544 F.2d 936, 938 8th Cir. 1976) (admitting noncustodial statements by defendant as admissions of a party-opponent because Fifth Amendment privilege was not implicated).  No misconduct arose from introduction.

To the extent that Petitioner relies on the *Grunewald* decision—which held that it "was prejudicial error for the trial judge to permit cross-examination of [a] defendant as to whether he had invoked his constitutional privilege against self-incrimination before a grand jury in response to same or similar questions in response to which he had testified fully on trial," 353 U.S. at 416–24, it is unclear how, if at all, that decision is applicable under the circumstances.  Petitioner did not testify at trial and the evidence at issue is a letter, not grand jury testimony.

### 3.   Ground Fourteen: *Brady* and *Giglio* Materials

Petitioner claims that the United States learned Officer Pendergrass was under investigation for unrelated conduct in February of 2008—five months before trial, but failed to inform defense counsel. He claims that the omission amounts to prosecutorial misconduct.

Petitioner raised a similar argument in one of his motions for a new trial [Docs. 147, 151]; the Court summarized that argument is follows:

> In his third motion for new trial, Jones conjures up a different story based on a frivolous claim of newly discovered evidence. In about April 2010, Jones learned that Officer Pendergrass was under an internal affairs investigation and on administrative leave from the Chattanooga Police Department because of his association with members of the Outlaws Motorcycle Gang. Jones submits some news articles showing that Officer Pendergrass resigned from the Chattanooga Police Department on March 9, 2010. Jones contends that this is the new evidence to support his instant motion for new trial under Fed. R. Crim. P. 33.

[Doc. 151 p. 6; Doc. 164 p. 4].  The motion was denied because "the evidence in [Petitioner's] case strongly support[ed] the jury's guilty verdict," meaning "a miscarriage of justice ha[d] not

28

occurred" [Doc. 151 p. 8].  Nor had Petitioner "offer[ed] any credible evidence beyond his self-serving statements to support a reasonable inference that [Officer Pendergrass] planted the cocaine and firearm to falsely incriminate [Petitioner], and that [he] gave perjured testimony at trial" [*Id.*].

The collateral challenge fails for the same reason as the request for a new trial—Petitioner has not provided any proof that the alleged withholding of information: (1) occurred; or (2) resulted in a miscarriage of justice.  *United States v. Bagley*, 473 U.S. 667 (1985).  With regard to the latter, the Court finds that the result at trial would not have been any different even if the jury had known about the investigation into Officer Pendergrass because the testimony of Officer Pendergrass was substantially corroborated by that of Newman, Smith, and another witness [Doc. 121 pp. 6–10, 79–88, 116–127].  *Cf. United States v. Giglio*, 405 U.S. 150 (1972) (awarding relief because case depended almost entirely on credibility of co-conspirator's testimony—without which there could have been no indictment or evidence to carry the case—because jury needed to know about agreements that might impact that credibility).  Absent a miscarriage of justice, there can be no collateral relief.  *See Macias*, 291 F.3d at 452 (citing *United States v. Carter*, 236 F.3d at 783).

Petitioner also challenges the United States' failure to "disclose[] that [it] told [Bridget Smith] that if she testi[fied] . . . against Petitioner that the gun charge against her would be dropped."  In support of the claim, Petitioner quotes portions of Task Force Officer David Ashley's grand jury testimony as proof that the United States "imposed [its] might on the grand jurors so [that] they would not indict [Smith] of the gun charge." The claim fails for two reasons.

First, Smith pled guilty pursuant to an information, meaning Petitioner's allegations that the United States somehow manipulated the grand jury in order to shape the charges against

29

Smith has no basis in fact [E.D. Tenn. Case No. 1:07-cr-24-HSM-WBC-1, Doc. 1 (Bill of Information)]. Second, review of the CM/ECF record demonstrates that the United States provided Petitioner with a copy of the co-conspirator's plea agreement and that defense counsel used that information to cross-examine Smith at trial [Doc. 121 pp. 146–50].

### 4. Ground Fifteen: Expert Witness List

Petitioner argues that the United States failed to disclose "the identity of [its] expert witnesses" as well as those "experts['] reports" and claims that the omission prevented defense counsel from adequately countering the § 922(g) and § 924(c) charges. Specifically, he claims that he did not receive an advance copy of the firearm trace report and that if he had, he would have called the previous registered owner "and asked him was that his gun and did [he] buy that gun, and was he in Chattanooga, Tennessee on June 11, 2006." He also says that he would have asked the prior gun owner if "they call [him] 'Hambone' or [if he] kn[e]w Richard Williams."

Despite Petitioner's claim to the contrary, the CM/ECF record shows that defense counsel was given timely notice of the United States' expert witness—ATF Agent Greg Moore, including that expert's qualifications and a summary of his expected testimony regarding the interstate nexus of the firearm and ammunition [Doc. 96]. Again, Petitioner's claim lacks any basis in fact.

### 5. Grounds Sixteen and Seventeen: Perjury and Cover-up

In a set of interrelated grounds, Petitioner alleges the following: arrows drawn on Officer Pendergrass affidavit of complaint were added in an attempt to fabricate evidence; submission of the altered document at trial amounted to false testimony, i.e., perjury; the United States facilitated that perjury when it submitted the altered affidavit and allowed Officer Pendergrass to testify to its veracity. He also suggests that the arrows indicate that "the wrong samples [were]

30

sent to the TBI lab for testing" and that reliance on the quantities in the altered report amounted to misconduct.

To the extent that Petitioner suggests that the arrows indicate a mix up in the samples, he has failed to provide any factual support for that claim. The omission is fatal. *See Short v. United States*, 504 F.2d 63, 65 (6th Cir. 1974) (explaining that if "claims are stated in the form of conclusions without any allegations of fact[] in support thereof," the § 2255 motion is "legally insufficient to sustain review"). To the extent that Petitioner suggests that the arrows call into question the quantity of drugs that he actually possessed and argues that the United States should not have introduced the TBI report, that claim fails because Petitioner has not established that the challenged conduct led to a miscarriage of justice. Jurors had more than enough evidence to convict Petitioner of conspiring to distribute 5 or more grams of crack cocaine even if they did not believe that Petitioner possessed all 11.6 grams tested by the TBI.

To the extent that Petitioner seeks relief because the arrows amounted to "false testimony," this Court has already rejected that arguement:

> After arresting Jones, Officer Pendergrass completed and executed an affidavit of criminal complaint against Jones which was presented to a Tennessee state court judge. In the affidavit of complaint Officer Pendergrass stated the different amounts of cocaine base (crack) and cocaine hydrochloride that he found and seized in the kitchen. Officer Pendergrass subsequently placed handwritten arrows on a copy of his affidavit of criminal complaint to indicate that there was an inadvertent mistake and the amounts or weights of the cocaine base (crack) and cocaine hydrochloride should be switched. This information about Officer Pendergrass drawing the arrows was known to Jones and his counsel at the trial. During the trial, counsel for Jones cross-examined Officer Pendergrass about this same matter. [Trial Transcript, Court Doc. No. 157, pp. 40-42].

> In an effort to conjure up some ground for a new trial, Jones makes a frivolous argument that this is somehow newly discovered evidence. Jones contends that Officer Pendergrass drew the arrows on the affidavit of criminal complaint for the purpose of deceiving Jones and committing a fraud upon the Court at trial.

> This argument fails. The Court is not persuaded that Officer Pendergrass drew the arrows on the affidavit of criminal complaint for the purpose of deceiving Jones and to commit a fraud upon the Court. There was no fraud upon the Court. Jones and his counsel were not deceived by the arrows.

[Doc. 159 pp. 13–14]. The Court is unaware of any reason that it should revisit its earlier finding that the altered affidavit of complaint was not a "fraud upon the Court." As such, no prosecutorial misconduct resulted from the introduction of that document or allowing testimony on the same.

## C.     Allegations of Legal Error

The amended petition contains three allegations of legal error: Petitioner's absence during discussions about the missing juror; the Court's failure to "admonish" members of the jury; and entitlement to relief based on the *Johnson* decision.

### 1.     Grounds Eighteen and Nineteen: Missing Juror

The Court will not review the merits of Grounds Eighteen and Nineteen—challenging Petitioner's absence during discussions about the missing juror and the Court's failure to "admonish" members of the jury over the incident—because Petitioner had the ability to raise those arguments on direct appeal, but did not. As a result, he has procedurally defaulted both theories of relief. *Compare Shropshire v. United States*, No. 1:08-CV-261, 2011 WL 4064704, at *13–14 (E.D. Tenn. Sept. 13, 2011) (explaining that a § 2255 motion is not a substitute for properly raising issues on direct appeal and failure to do so subjects a claim to procedural default); *Turner v. United States*, 191 F.3d 453 (6th Cir. 1999) (explaining that "a motion to vacate under § 2255 does not serve as a substitute for bringing a direct criminal appeal").

"In the case where the defendant has failed to assert his claims on direct appeal and thus has procedurally defaulted, in order to raise them in a § 2255 motion he also must show either

32

that (1) he had good cause for his failure to raise such arguments and he would suffer prejudice if unable to proceed, or (2) he is actually innocent." *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003); *accord United States v. Frady*, 456 U.S. 152, 167-68 (1982). The "hurdle" that a petitioner faces to excuse procedural default is "intentionally high[,] . . . for respect for the finality of judgments demands that collateral attack generally not be allowed to do service for an appeal." *Elzy v. United States*, 205 F.3d 882, 884 (6th Cir. 2000). Petitioner has not alleged his actual innocence, nor has he put forth any good cause for his failure to challenge the errors alleged in Grounds Eighteen and Nineteen on direct appeal [Docs. 170, 171, 182, 214, 224]. Because both have been procedurally defaulted, neither will be addressed under § 2255.

### 2.     Ground Twenty: Relief based on the *Johnson* Decision

The ACCA mandates a fifteen-year sentence for any felon who unlawfully possesses a firearm after having sustained three prior convictions "for a violent felony or a serious drug offense, or both, committed on occasions different from one another." 18 U.S.C. § 924(e)(1) (emphasis added). The provision defines "serious drug offense" as any "offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance . . . for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(A)(ii). The Act goes on to define "violent felony" as "any crime punishable by imprisonment for a term exceeding one year" that (1) "has as an element the use, attempted use, or threatened use of physical force against the person of another" (the "use-of-physical-force clause"); (2) "is burglary, arson, or extortion, involves the use of explosives" (the "enumerated-offense clause"); or (3) "otherwise involves conduct that presents a serious potential risk of physical injury to another" (the "residual clause"). 18 U.S.C. § 924(e)(2)(B). Only the third portion of the above definition—the residual clause—was held to

33

be unconstitutionally vague by the Supreme Court in the *Johnson* decision. 135 S. Ct. at 2563. The Court went on to make clear, however, that its decision did not call into question the remainder of the ACCA's definition of violent felony—the use-of-physical-force and enumerated-offense clauses. *Id.*; *United States v. Priddy*, 808 F.3d 676, 682–83 (6th Cir. 2015). Nor does the *Johnson* decision disrupt the use of a defendant's prior serious drug offenses as an independent form of ACCA predicate conviction. *See, e.g.*, *United States v. Smith*, No. 10-CR-20058, 2015 WL 5729114, at *9–13 (E.D. Mich. Sept. 20, 2015) (noting that *Johnson* does not affect a defendant's categorization as an armed career criminal based on his or her prior serious drug offenses).

Section 4B1.1 classifies a defendant as a career offender if (1) he or she was at least eighteen years old at the time the defendant committed the instant offense; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) he or she has at least two prior felony convictions of either a crime of violence or a controlled substance offense. U.S. Sentencing Manual § 4B1.1(a). Only Petitioner's satisfaction of the third prong—possession of two qualifying predicate convictions—is disputed.

"Controlled substance offense" is defined as any offense "punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance . . . or the possession of controlled substance . . . with intent to manufacture, import, export, distribute, or dispense." U.S. Sentencing Manual § 4B1.2(b). "Crime of violence" is defined in an almost identical manner as "violent felony" under the ACCA. *See* U.S. Sentencing Manual §4B1.2(a) (adopting identical use-of-force and residual clauses as well as a nearly identical enumerated-offense clause).

34

The validity of Petitioner's sentence thus depends on whether three or more of his prior convictions qualify as violent felonies under one of the unaffected provisions of § 924(e)(2)(B) or as serious drug offenses under § 924(e)(2)(A), and whether two or more of his prior convictions qualify as crimes of violence under one of the unaffected provisions of Section 4B1.2(a) or as controlled substance offenses under Section 4B1.2(b). *See, e.g.*, *United States v. Ozier*, 796 F.3d 597, 604 (6th Cir. 2015) (rejecting challenge where the petitioner's prior convictions qualified as predicate offenses independent of the now-defunct residual clause), *overruled on other grounds by Mathis v. United States*, 136 S. Ct. 2243, 2251 n. 1 (2016). To determine whether an offense qualifies under one of the above provisions, courts must first identify the precise crime of conviction by employing a "categorical approach," looking "only to the statutory definitions—elements—of a prior offense, and not to the particular facts underlying [each individual] conviction[]." *Descamps v. United States*, 133 S. Ct. 2276, 2283, 2285 (2013).

Review of Petitioner's PSR reveals that a sufficient number of his convictions categorically qualify as predicates independent of the ACCA and Guideline residual clauses. Specifically, binding Sixth Circuit authority dictates that at least three of Petitioner's prior Tennessee robbery convictions [PSR ¶¶ 42–46, 48], categorically qualify as violent felonies and crimes of violence under the ACCA and Guidelines use-of-physical-force clauses. *See, e.g.*, *United States v. Taylor*, 800 F.3d 701, 719 (6th Cir. 2015) ("[T]he Supreme Court's holding in *Johnson* leaves unaffected this Court's determination that simple robbery in Tennessee is a predicate offense under the 'use-of-physical-force' clause."); *United States v. Mitchell*, 743 F.3d 1054, 1058–60 (6th Cir. 2014) (holding that all forms of Tennessee robbery are predicate offenses under the use-of-physical-force clause). Thus, the *Johnson* decision has no impact on ACCA or career offender designation.

To the extent Petitioner argues that the *Johnson* decision invalidated the residual clause in § 924(c)(3)(B) and that the absence of that provision requires vacatur of his conviction under § 924(c)(1)(A), that argument fails for two reasons.

First, while the *Johnson* decision invalidated the residual provision of the ACCA and identically worded clause in Section 4B1.2, § 924(c)(3)(B)'s definition of crime of violence remains unaffected.[4] *See United States v. Pawlak*, 822 F.3d 902, 911 (6th Cir. 2016) (concluding "rationale of *Johnson* applies equally" to the Guidelines' definition of crime of violence); *United States v. Taylor*, 814 F.3d 340, 376–79 (6th Cir. 2016) (recognizing at least four "significant differences" between the residual clause in § 924(c)(3)(B) and the ACCA's residual clause and noting "the argument that *Johnson* effectively invalidated [the former] is . . . without merit").

Second, even if the *Johnson* decision's reasoning could be used to invalidate § 924(c)(3)(B)'s residual clause, Petitioner's conviction under § 924(c)(1)(A) did not rely on that provision. To the contrary, Petitioner was convicted of possessing a firearm in furtherance of a drug trafficking crime, not crime of violence. The statute defines "drug trafficking crime" as "any felony punishable under the Controlled Substances Act, 21 U.S.C. §§ 801, et seq., [or] the Controlled Substances Import and Export Act, 21 U.S.C. §§ 951, et seq." 18 U.S.C. § 924(c)(2). The *Johnson* decision has no bearing whatsoever on the scope of that definition. *Accord United States v. Jenkins*, 613 F. App'x 754, 755 (10th Cir. 2015) (deeming the decision irrelevant to

---

[4]     Section 924(c)(1)(A) makes it a crime for an individual, "in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, [to] use[,] carr[y] [or possess] a firearm . . . in furtherance of . . . such crime." 18 U.S.C. § 924(c)(1)(A). Section 924(c)(3) goes on to define "crime of violence" as any "felony" that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (use-of-physical-force clause); or "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" ("residual clause").

36

drug offenses).  The drug offense underlying Petitioner's § 924(c) charge involved a violation of

the Controlled Substances Act, and thus the *Johnson* decision does not provide a basis for relief.

## IV.      CONCLUSION

For the reasons discussed, Petitioner's first and third motions for leave to amend [Doc.

182, 224] will be **GRANTED**, second motion for leave to amend [Doc. 214] will be **DENIED**,

and amended petition [Docs. 170, 182, 225] will be **DENIED** and **DISMISSED WITH**

**PREJUDICE**.  Petitioner's motions for an extension of time to reply and to compel [Docs. 234,

235, 242] will be **DENIED as moot**.  The Court will **CERTIFY** any appeal from this action

would not be taken in good faith and would be totally frivolous.  Therefore, this Court will

**DENY** Petitioner leave to proceed *in forma pauperis* on appeal.  *See* Rule 24 of the Federal

Rules of Appellate Procedure.  Petitioner having failed to make a substantial showing of the

denial of a constitutional right, a certificate of appealability **SHALL NOT ISSUE**.  28 U.S.C. §

2253; Rule 22(b) of the Federal Rules of Appellate Procedure.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**


_____*/s/ Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE